UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| PATRICIA AMOS; MAXINE MIMS; and MARIE EDWARDS, on behalf of themselves and all others similarly situated, | Case No. 06-CV-1281 (PJS/RLE) |
| Plaintiffs, | |
| v. | ORDER DENYING MOTION FOR CLASS CERTIFICATION |
| GEICO CORPORATION; GOVERNMENT EMPLOYEES INSURANCE COMPANY; GEICO GENERAL COMPANY; GEICO CASUALTY COMPANY; and GEICO INDEMNITY COMPANY, | |
| Defendants. | |

Joseph M. Sellers and Llezlie L. Green, COHEN, MILSTEIN, HAUSFELD & TOLL PLLC; James H. Kaster, David E. Schlesinger, and E. Michelle Drake, NICHOLS KASTER & ANDERSON, PLLP; and Jay Angoff, ROGER G. BROWN & ASSOCIATES, for plaintiffs.

David P. Gersch, Elissa J. Preheim, and Anthony Franze, ARNOLD & PORTER LLP; and Linda L. Holstein, Anh Le Kremer, and Kerri J. Nelson, HOLSTEIN KREMER, PLLC, for defendants.

Defendants are a group of related companies that sell automobile insurance.  Plaintiffs bring this putative class action under 42 U.S.C. § 1981, alleging that defendants intentionally and systematically discriminate against African-Americans by using underwriting practices that favor customers who have college degrees and who work in certain white-collar jobs.  In essence, plaintiffs allege that defendants use education and occupation not because they are valid measures of underwriting risk, but as proxies for race.  This matter is before the Court on plaintiffs' motion for class certification.  For the reasons set forth below, plaintiffs' motion for class certification is denied.

I.  BACKGROUND

*A.  GEICO and its Underwriting Practices*

Defendants Government Employees Insurance Company ("GE"), GEICO General

Company ("GEICO General"), GEICO Casualty Company ("GEICO Casualty"), and GEICO

Indemnity Company ("GEICO Indemnity") (collectively "GEICO") compose a family of related

companies that sell automobile insurance.[1]  Each company underwrites its own policies using

different "base" premium rates that are adjusted for each policyholder.  Drake Aff. Ex. 19 at 2.

An applicant who is considered a low risk is generally placed in GE or GEICO General.

McCutcheon Dep. 14; Drake Aff. Ex. 19 at 2.  An applicant who is considered a standard risk is

generally placed in GEICO Indemnity, and an applicant who is considered a high risk is generally

placed in GEICO Casualty.  McCutcheon Dep. 14-15.  For obvious reasons, GEICO Indemnity

and GEICO Casualty have higher base rates than GE or GEICO General.  Drake Aff. Ex. 19 at 2.

Each company not only has its own base rate, but each company uses various "tiers" to further

segment their customers by level of risk.  Each tier represents a pricing point that is higher or

lower than the company's base rate.

When a customer applies for a GEICO policy, GEICO places the applicant in a particular

tier within a particular company.  To identify the proper company and tier, GEICO uses a

computerized underwriting[2] system that assigns a numerical score to each characteristic of an

_____

[1]The fifth defendant, GEICO Corporation, is a holding company for the other four and
does not underwrite any policies.  McCutcheon Dep. 8.  The four underwriting companies share
the same officers and directors, but the holding company has its own set of officers and directors.
McCutcheon Dep. 238-39.

[2]Technically speaking, "underwriting" is the process of determining whether to insure a
risk at all, and "rating" is the process of determining the premium to charge for a risk that the

applicant that GEICO considers relevant to underwriting. The more favorably that GEICO views the risk associated with a particular characteristic, the higher the score that GEICO assigns to that characteristic. The applicant's total score, which is calculated by adding the scores for each of the applicant's relevant characteristics, determines the company and tier in which the applicant is placed — and that, of course, determines the amount of the premium that is charged to the applicant.

Among the characteristics to which GEICO assigns a score are an applicant's educational level and occupation — the practices being challenged by the plaintiffs in this putative class action. To understand GEICO's use of education and occupation as underwriting factors (as well as GEICO's corporate structure), it is helpful to understand a bit of GEICO's history.

GEICO was originally founded in the 1930s for the purpose of providing insurance to government and military employees. Drake Aff. Ex. 4 at NKA112034. Over the years, though, GEICO gradually expanded its customer base. In the late 1950s, GEICO began offering policies to professional and technical workers who were not employed by the government or the military, but who otherwise met GEICO's eligibility requirements. Drake Aff. Ex. 4 at NKA112035. Eventually, a sister company that later became known as GEICO Indemnity was formed to provide insurance to customers who did not meet the stricter eligibility requirements of GEICO; those customers included both policyholders who were employed by the government or the military and policyholders who were not. Drake Aff. Ex. 4 at NKA112035.

---

company has decided to insure. Drake Aff. Ex. 12 at 9; McCutcheon Dep. 11-12. GEICO's underwriting practices are really a blend of underwriting and rating in that the underwriting determination effectively determines the base rate and tier placement. Drake Aff. Ex. 12 at 9; McCutcheon Dep. 11-12, 333. To arrive at a final premium, GEICO adjusts the base rate on the basis of various factors, such as age, sex, and marital status. McCutcheon Dep. 323.

In the 1970s, GEICO replaced the eligibility requirements used to distinguish customers placed with GEICO[3] from customers placed with GEICO Indemnity with an expanded system of underwriting guidelines that somewhat blurred the distinction between the two companies. Drake Aff. Ex. 4 at NKA112035.  Perhaps as a result of its new underwriting practices, GEICO (that is, the overall enterprise) ran into financial trouble.  At about this time, GEICO's new CEO, Jack Byrne, questioned the use of occupation in the underwriting process.  Drake Ex. 13 at NKA083258.  Byrne hired an independent actuarial firm to review GEICO's use of occupation as an underwriting factor; the firm concluded that GEICO's use of occupation in underwriting was, in fact, actuarially sound.  Drake Ex. 13 at NKA083258-59.

GEICO reviewed its use of occupation again in the 1980s.  While analyzing its loss experience by occupation, GEICO noticed that occupations requiring more formal education generally had better loss experience than occupations that did not require much formal education. Drake Aff. Ex. 13 at NKA083260.  In light of this discovery, GEICO developed a set of occupational groupings.  According to a recent GEICO internal document, the revised occupational groupings implemented in the 1980s are, "[f]or the most part, . . . the same group definitions we have today."  Drake Aff. Ex. 4 at NKA112037.

GEICO's original groupings were largely based on the level of education required for a given occupation.  But GEICO made exceptions when an occupation's loss experience was better or worse than GEICO expected.  Drake Aff. Ex. 13 at NKA083260.  For example, if a "high education" occupation had a bad loss experience, GEICO would move that occupation into a

---

[3]Although nothing in the record seems to state explicitly that the "GEICO" referred to in historical documents is the company known today as Government Employees Insurance Company (or "GE"), presumably that is the case.

lower group and charge higher premiums; likewise, if a "low education" occupation had a good

loss experience, GEICO would move that occupation into a higher group and charge lower

premiums.

Currently, GEICO's occupation groups are defined as follows:

Group 1    Group 1 occupations have exhibited superior loss experience in the past.
           Generally these occupations require a bachelor's degree, and some applicants
           will have advanced degrees.  Occupations in this group include accountants
           (Note: several states *do not* require CPA's to have bachelor's degrees),
           administrators, architects, commercial writers, graphic or technical designers,
           dentists, editors, engineers, judges, lawyers, navigators, pharmacists, pilots and
           professional Federal employees in an administrative or technical position.

Group 2    Group 2 occupations usually require a bachelor's degree; some applicants will
           have advanced degrees.  Typical occupations are physicians, actuaries,
           dietitians, teachers, veterinarians and college educated sales representatives
           with a high degree of technical knowledge in fields such as airplanes or
           computers, etc.

Group 3    Group 3 occupations usually require at least a high school diploma, but usually
           less than a bachelor's degree, nonclerical in nature, and involve problem
           solving and/or decision making and the use of judgement [sic].  Typically, they
           are technicians with vocational training or an associate's degree, wholesale
           nonspecialized sales representatives, supervisors and managers of clerical
           staffs, farmers, policemen, firemen and those administrators or professional
           and technical personnel not in Groups 1 and 2.

Group 4    Group 4 occupations usually require a high school diploma.  Some may
           require vocational training or even 2 years of college.  Typical occupations are
           clerical positions using special knowledge or exercising judgment/decision
           making responsibilities, technicians with on-the-job training, sales
           representatives not included in Groups 2 and 3, higher skilled artisans,
           opticians, plumbers, office machine operators such as duplicating machine
           operators and foremen.

Group 5    Group 5 occupations include minimally-skilled clerks, assistants, bartenders
           and bouncers.  Also included are long haul drivers, route men, unskilled and
           semiskilled workers.

Drake Aff. Ex. 7 at 5.  There is also a group 7, comprising students, and a group 8, comprising

active military personnel.  Drake Aff. Ex. 7 at 6.  (At some point, GEICO folded what was

formerly group 6 into another group.  Drake Aff. Ex. 13 at NKA083260.)  Of the over 2100

occupations that GEICO tracks, about 800 are in group 5.  Drake Aff. Ex. 8 at 015077-117.

   In the mid-1990s, GEICO overhauled its underwriting practices yet again, this time with

the help of Fair Isaac Corporation.  As part of this overhaul, GEICO developed an automated

underwriting system called Computer Assisted Underwriting, or CAU.  Drake Aff. Ex. 4 at

NKA112038-39.  Whereas GEICO's previous underwriting practices were intended to attract

preferred risks, the goal of the new CAU model was to underwrite all risks at appropriate rates.

Drake Aff. Ex. 4 at NKA112038-39.  GEICO was also concerned that regulators and legislators

in some key states might ban the use of occupation as an underwriting factor.  Drake Aff. Ex. 4 at

NKA112039.  CAU was designed to address this concern by expanding the number of

underwriting factors that GEICO considered, thereby making GEICO less dependent on

occupation.  Drake Aff. Ex. 4 at NKA112039.

   GEICO developed the CAU process only for underwriting new business — that is, for

determining the company and tier in which a new customer should be placed.  In the course of

developing the CAU model, GEICO reviewed its historical new-business loss experience and

matched that information with information about individual policyholders.  Drake Aff. Ex. 4 at

NKA112039.  GEICO selected the most predictive characteristics to include in the CAU model.

Drake Aff. Ex. 4 at NKA112039.  GEICO then designed the CAU model to weigh those

characteristics differently, depending on how predictive each characteristic had proven to be.  To

accomplish this weighing, numerical scores were assigned to what are called the "attributes" of

each characteristic.  Drake Aff. Ex. 4 at NKA112039, NKA112052; Drake Aff. Ex. 13 at

NKA083265.  For example, "marital status" is a characteristic having two possible attributes:

"married" or "single."  GEICO assigns more points to the "married" attribute than to the "single"

attribute because, in GEICO's experience, those who are married are better risks than those who

are single.  Similarly, for the characteristic "occupation," GEICO assigns different scores to each

of the seven occupational attributes or groups.  Occupations with better loss experience are given

higher scores.  Drake Aff. Ex. 13 at NKA083265.  The sum of all of the points for an applicant's

particular set of attributes is called the applicant's "CAU score."

To determine company and tier placement, GEICO compares an applicant's CAU score

to a threshold (or "cut") score.[4]  Drake Aff. Ex. 4 at NKA112042, NKA112052.  As noted, each

of the four underwriting companies within GEICO specializes in insuring a particular level of

risk.  So, for example, the minimum cut score needed to qualify for GEICO General, which

underwrites preferred non-government and non-military risks, is higher than the minimum cut

score needed to qualify for GEICO Casualty, which underwrites non-standard risks.  *Cf.* Drake

Aff. Ex. 4 at NKA112043.  Although GEICO sales representatives can override the company or

tier placement dictated by an applicant's CAU score, that does not often happen.  Most of the

time, the CAU placement is final.  Lavrey Dep. 141; McCutcheon Dep. 75, 78.

---

[4]Certain undesirable attributes are also assigned what is known as an "accept/reject" score.  Lavrey Decl. ¶ 15.  Such attributes include previously driving without insurance or a recent DWI conviction.  *Id.*  An applicant's aggregate "accept/reject" score can render that applicant ineligible for placement in a preferred company regardless of the customer's CAU score.  *Id.*  There are no "accept/reject" scores associated with an applicant's level of education or occupation.  *Id.*

Of the nearly thirty underwriting characteristics about which GEICO collects information, CAU uses seventeen to score applicants. Drake Aff. Ex. 4 at NKA112052; Drake Aff. Ex. 17 at NKA068486. GEICO considers occupation to be one of the most predictive characteristics, and thus occupation weighs heavily in the CAU process.[5] Drake Aff. Ex. 17 at NKA068486; McCutcheon Dep. 278-79 (agreeing that "[o]ccupation is still [GEICO's] most important underwriting factor in most states"). Generally speaking, occupation group 5 is treated as the least favorable occupation group — that is, applicants in occupation group 5 are normally given a lower score than applicants in the other occupation groups (although in some circumstances applicants in groups 4 and 5 may receive the same score). Drake Aff. Ex. 7 at 3; Lavrey Dep. 112-13. Likewise, applicants with a bachelor's degree or higher level of education always receive a higher score for that attribute than those without a bachelor's degree. Drake Aff. Ex. 7 at 4. This is not to say, though, that being placed in occupation group 5, or lacking a bachelor's degree, necessarily disqualifies an applicant from being treated as a preferred risk. Theoretically, an applicant could amass enough points from the other fifteen characteristics that are scored to be placed in a preferred-risk company. Lavrey Decl. ¶ 10. But plaintiffs allege that GEICO weighs education and occupation so heavily that, in practice, they are highly determinative of company and tier placement.

---

[5]GEICO refers to the numerical score assigned to an attribute as the "weight." *See, e.g.*, Defs.' Second Corrected Mem. Opp. Class Cert. 6; Drake Aff. Ex. 4 at NKA112052. But GEICO also refers to the "weight" given to an overall characteristic (as opposed to the particular attributes within that characteristic). *See, e.g.*, Drake Aff. Ex. 17 at NKA068486. When GEICO refers to the "weight" given to a characteristic, the Court understands it to be referring not to the particular score given to any one of the various attributes within that characteristic, but rather to the relative share of the total CAU score that is dependent on that characteristic.

GEICO has refined the CAU model over time.  In 1998, again with the help of Fair Isaac, GEICO used an expanded set of data to reevaluate CAU.  Drake Aff. Ex. 4 at NKA112040.  As a result of this reevaluation, GEICO added some characteristics and dropped others; it continued to use education and occupation as characteristics, though.  Drake Aff. Ex. 4 at NKA112040.  In 2001, GEICO again made significant changes to its model after it found that, although occupation correlated highly with loss for GE and GEICO General customers, it was less predictive of loss for GEICO Indemnity and GEICO Casualty customers.  Drake Aff Ex. 13 at NKA083265; Drake Aff. Ex. 4 at NKA112040.  To account for this finding, GEICO developed a new model — a model that placed less emphasis on occupation — to evaluate customers who are not placed into GE or GEICO General.  Drake Aff. Ex. 13 at NKA083265-66; Drake Aff. Ex. 4 at NKA112040.  Aside from these major revisions, GEICO reviews CAU weights every year and changes them as necessary.  Drake Aff. Ex. 4 at NKA112045-46.  GEICO also continuously tracks its claims experience by occupation and, based on periodic reviews of that information, moves particular occupations from one group to another.  Drake Aff. Ex. 8 at 2-3; Drake Aff. Ex. 13 at NKA083262; McCutcheon Dep. 381-83.

GEICO's CAU model has made its underwriting process highly standardized across the country, but there are nevertheless regional variations.  Some underwriting factors are given different weights in different states or regions, although the variations do not appear significant. Drake Aff. Ex. 4 at NKA112045-46; Drake Aff. Ex. 17 at NKA068486 ("In general, the CAU weights are the same for most states, except for legal restrictions.").  GEICO also employs product managers responsible for developing recommendations for their assigned states.  These

recommendations can include changes to CAU characteristics, CAU weights, cut scores, and tiers.  Drake Aff. Ex. 4 at NKA112046.

As noted, GEICO uses CAU only for underwriting new business.  A typical GEICO policy is six months in duration; thus, a GEICO customer is normally reevaluated twice a year at the renewal stage.  McCutcheon Dep. 288.  In late 2002, GEICO developed its first computer-assisted *re*underwriting model.  Drake Aff. Ex. 4 at NKA112040-41.  Although, as noted, an applicant in occupation group 5 could theoretically be placed in any of the four underwriting companies (depending on his or her score on the other sixteen characteristics), it appears that GEICO does have some restrictions on moving policyholders in occupation group 5 to the preferred companies during the reunderwriting process.  McCutcheon Dep. 349-50. Nevertheless, to the extent that there is movement between the companies at the renewal stage, it is far more common for GEICO policyholders to be "upgraded" to a more preferred company, or to a more favorable pricing tier within the same company, than to be "downgraded" to a less-favorable company or pricing tier.  McCutcheon Dep. 301.

### B.  The Proposed Class Representatives

Plaintiffs are all Minnesota residents, all African-Americans, and all former GEICO policyholders.  Plaintiffs allege that GEICO is and for decades has been hostile to African-Americans.  According to plaintiffs, GEICO knows that it cannot refuse to underwrite risks for African-Americans or force African-Americans to use other car insurance companies by charging African-Americans higher premiums.  Thus, plaintiffs allege, GEICO uses education and occupation as "proxies" for race.  In other words, plaintiffs contend that GEICO does not charge higher premiums to those who do not have college degrees because they are higher risks, but

because they are disproportionately African-Americans.  Likewise, according to plaintiffs, GEICO does not charge higher premiums to those who work in certain occupations because they are higher risks, but because those occupations are disproportionately filled by African-Americans.  Plaintiffs' theory appears to be that the lengthy history recounted above — that is, the many studies and adjustments to the underwriting process made by dozens or hundreds of people over three or four decades — was, in fact, all an elaborate ruse to hide the fact that GEICO was hostile to African-Americans.  From the beginning, according to plaintiffs, GEICO has been using education and occupation in the underwriting process not in an attempt to maximize profits, but in an attempt to minimize the number of African-American policyholders.

There are three named plaintiffs.  Patricia Amos, who has a ninth-grade education, was placed in occupation group 5 during the underwriting process.  Amos Dep. 11; Drake Aff. Ex. 23.   Amos was insured with GEICO Casualty for less than one year, from March 2005 to February 2006.  Lavrey Decl. ¶ 62.  During that time, Amos made more than seven claims on her policy.  Lavrey Decl. ¶ 62.  Amos's policy was eventually cancelled for nonpayment of her premium.  Lavrey Decl. ¶ 62.  Although Amos does not currently own a car, she states that "[i]f GEICO eliminated its practice [of using education and occupation as underwriting factors], I expect that GEICO would be able to offer me a more competitive rate and I would be able to return to being a GEICO customer."  Amos Decl. ¶ 3; Amos Dep. 51, 79, 142.

Plaintiff Marie Edwards, who is a high-school graduate, was also placed in occupation group 5 during the underwriting process.   Edwards Dep. 9; Drake Aff. Ex. 24.  Edwards initially held a GEICO policy for one month, from May to June 2003, but that policy was cancelled for nonpayment of premium.  Lavrey Decl. ¶ 63.  In December 2004, Edwards purchased another

GEICO policy, but she once again failed to pay her premium, and that policy was cancelled in April 2005.  Lavrey Decl. ¶ 63.  Both of Edwards's policies were underwritten by GEICO Indemnity; she was not eligible for a preferred company because she had previously driven without insurance.  Lavrey Decl. ¶ 63.  Edwards states that, if GEICO ended its practice of using education and occupation as underwriting factors, she "would be interested in returning to being a GEICO customer."  Edwards Decl. ¶ 3.

Plaintiff Maxine Mims purchased insurance from GEICO Indemnity in April 2004. Lavrey Decl. ¶ 64.  At the time, GEICO placed Mims in occupation group 5 and treated her as a high-school graduate for underwriting purposes.  Lavrey Decl. ¶ 67.  Mims was ineligible for a preferred company because she had previously driven without insurance.  Lavrey Decl. ¶ 64. Although Mims was initially quoted a rate in tier 3 of GEICO Indemnity, GEICO placed Mims in tier 4 after it discovered other information about her, including a conviction for driving on a restricted license.  Lavrey Decl. ¶ 64.  Six months later (at the renewal stage), Mims was recategorized as occupation group 7.  Lavrey Decl. ¶ 67.  In February 2005, the policy was cancelled for nonpayment of premium.  Lavrey Decl. ¶ 66.  GEICO reissued the policy in April 2005 (again placing Mims in group 7), but it was again cancelled for nonpayment of premium in April 2007.  Lavrey Decl. ¶ 66.  While insured by GEICO, Mims's husband, Edward Mims (who was at one time a plaintiff in this action), was convicted of four driving offenses, and he was also involved in an accident that resulted in GEICO paying more than $24,000 in claims.  Lavrey Decl. ¶ 65.  Mims states that if GEICO ended its practice of using education and occupation as underwriting factors, GEICO would offer a more competitive rate, and she would be able to return as a GEICO customer.  Mims Decl. ¶ 4.

## II.  CLASS CERTIFICATION

Plaintiffs seek to represent a class defined as follows:

> All African Americans who purchased or renewed an automobile
> insurance policy issued by GEICO at any time from April 3, 2000
> to the first day of trial, who lack a bachelor's degree, and who were
> placed in GEICO's occupation "Group 5."

Pls.' Mot. Class Cert. [Docket No. 65].

For a class to be certified, plaintiffs must meet all of the criteria of Rule 23(a) and fall

within one of the categories of Rule 23(b).  Plaintiffs bear the burden of showing that the class

should be certified and that the requirements of Rule 23 are met.  *Coleman v. Watt*, 40 F.3d 255,

258 (8th Cir. 1994).  District courts have wide discretion in determining whether certification of

a class is appropriate.  *Coley v. Clinton*, 635 F.2d 1364, 1378 (8th Cir. 1980).  But district courts

must exercise that discretion within the standards set by Rule 23, which requires a "rigorous

analysis" to ensure that class certification is appropriate.  *Gen. Tel. Co. of Sw. v. Falcon*, 457

U.S. 147, 161 (1982).

In deciding whether to certify a class under Rule 23, a district court may not take into

account the strength of the plaintiffs' claims on the merits.  *Eisen v. Carlisle & Jacquelin*, 417

U.S. 156, 177 (1974).  In other words, a district court may not deny class certification because it

views the plaintiffs' claims as weak, or grant class certification because it views the plaintiffs'

claims as strong.  Nevertheless, a district court may look beyond the pleadings and assess the

state of the evidence.  In particular, a district court may analyze what the plaintiffs will have to

prove and how the plaintiffs will have to prove it.  *See Blades v. Monsanto Co.*, 400 F.3d 562,

566-67 (8th Cir. 2005) (in determining whether common issues predominate, courts should

resolve factual issues only to the extent necessary to determine whether the same evidence will suffice to prove the claims of all class members); *cf. Elizabeth M. v. Montenez*, 458 F.3d 779, 786 (8th Cir. 2006) ("Though class certification is not the time to address the merits of the parties' claims and defenses, the 'rigorous analysis' under Rule 23 must involve consideration of what the parties must prove.").

### A.  Rule 23(a)

Under Rule 23(a), the four prerequisites for class certification are numerosity, commonality, typicality, and adequacy.  After carefully considering the evidence, the Court concludes that plaintiffs have failed to meet the prerequisites of commonality and typicality.

### 1.  Commonality

For a class to be certified, there must be a question of law or fact common to the class. Fed. R. Civ. P. 23(a)(2).  "Rule 23(a)(2) requires that there be common questions of law or fact among the members of the class.  The rule does not require that every question of law or fact be common to every member of the class[.]"  *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 561 (8th Cir. 1982).

At the same time, not every common question of law or fact will suffice to meet the commonality requirement.  In every putative class action, the plaintiffs share in common the ultimate question, such as "Did the defendants discriminate against the plaintiffs on the basis of race?"  But that does not mean that every putative class action meets the commonality requirement.  "In order to determine whether there is truly a common question of law or fact for purposes of Rule 23(a)(2), a court must dig deeper and identify the legal and factual issues on which the ultimate question will turn."  *Good v. Ameriprise Fin., Inc.*, 248 F.R.D. 560, 569

(D. Minn. 2008).   To be considered a common question of fact, the issue must be susceptible to

class-wide proof.   *Cooper v. S. Co.*, 390 F.3d 695, 714 (11th Cir. 2004).   In other words, the

factual question must be precisely the same for every single member of the class, so that, based

on evidence common to the class, the jury can answer that question once, and that single answer

will dispose of that factual question with respect to all class members.

   Plaintiffs bring their claim under 42 U.S.C. § 1981, which states, in relevant part:

> All persons within the jurisdiction of the United States shall have
> the same right in every State and Territory to make and enforce
> contracts, to sue, be parties, give evidence, and to the full and equal
> benefit of all laws and proceedings for the security of persons and
> property as is enjoyed by white citizens, and shall be subject to like
> punishment, pains, penalties, taxes, licenses, and exactions of
> every kind, and to no other.

To prevail under § 1981, plaintiffs must prove that GEICO intentionally discriminated against

them on the basis of race.   *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391

(1982).   It is not sufficient to demonstrate that education and occupation are poor measures of

underwriting risk, or that GEICO's use of education and occupation as underwriting factors

worked to the disadvantage of African-Americans.   Rather, plaintiffs must prove that GEICO

used education and occupation for the *purpose* of harming African-Americans.

   GEICO first argues that class certification is improper because, to establish liability under

§ 1981, plaintiffs must prove that the discrimination was a but-for cause of damages.   Because

the issue of damages is individual to each class member, GEICO argues, the issue of liability

cannot be litigated on a class-wide basis.   But contrary to GEICO's assertions, the Eighth Circuit

has previously held that § 1981 does not require that plaintiffs prove, as a prerequisite to a

finding of *liability*, that the discrimination was a but-for cause of *damages*.   *Edwards v. Jewish*

*Hosp. of St. Louis*, 855 F.2d 1345, 1348-52 (8th Cir. 1988) (jury's finding that employer would have discharged the plaintiff even in the absence of intentional racial discrimination did not preclude plaintiff from recovering nominal and punitive damages). Of course, to recover compensatory damages, plaintiffs would have to prove that they were actually damaged — and that could theoretically require thousands of individual trials. But the question of whether and to what extent each plaintiff was damaged is a separate issue from the question of whether GEICO used education and occupation in the underwriting process for the purpose of discriminating against African-Americans. *Cf. id.* at 1352-53.

At first glance, the question whether GEICO engaged in racial discrimination by using education and occupation in underwriting would seem to be an issue shared by every member of the proposed class. GEICO created a highly automated CAU system through which every class member's application was processed. If, as plaintiffs allege, GEICO intentionally used education and occupation as proxies for race in creating this system, then, it would seem, every member of the class was subjected to the same unlawful discrimination, even if every class member was not ultimately charged a higher premium because of that discrimination.[6]

-----

[6]Plaintiffs characterize this as a "pattern or practice" discrimination case. In such cases, if plaintiffs can prove that discrimination was a company's "standard operating procedure," they are entitled to a rebuttable presumption that every member of the class was a victim of intentional discrimination. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336, 359-61 (1977). But plaintiffs also agree that the *Teamsters* framework is inapplicable where proof of liability is individualized. Pls.' Reply 3; *Cf. Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1236-1240 (11th Cir. 2000) (declining to apply the *Teamsters* framework in a non-employment § 1981 case). As discussed in the text, liability in this case cannot be established on a classwide basis, and the Court therefore concludes that the *Teamsters* framework is inapplicable here.

The problem is that plaintiffs are not really challenging the fact that GEICO *uses* education and occupation as underwriting factors.  Plaintiffs concede that insurance companies could make use of education and occupation without violating § 1981.  Instead, plaintiffs are challenging the *particular way* that GEICO uses education and occupation.  As to occupation specifically, plaintiffs are contending that GEICO has given unfavorable treatment to *particular* occupations (those in group 5) — and that GEICO  has done so not because those *particular* occupations represent high risks, but because those *particular* occupations are disproportionately filled by African-Americans.

As noted, GEICO tracks over 2100 occupations, and there are nearly 800 occupations in group 5 — the group to which all members of the putative class belong.  With respect to each one of those hundreds of occupations, one or more people at GEICO made one or more decisions during one or more years to treat members of that occupation less favorably.  Recall, too, that GEICO continually reevaluates its occupational categories and moves occupations from one group to another.  Thus, GEICO regularly makes decisions with respect to *all* of the 800 or so occupations in group 5 — either a decision to move that occupation out of group 5, or a decision *not* to move that occupation out of group 5.  In short, by claiming that GEICO has intentionally structured its occupational categories to discriminate on the basis of race, plaintiffs seek to put in issue every one of thousands of decisions made by a wide variety of GEICO employees (and outside consultants) over a period of several decades.

With respect to each occupation in group 5, plaintiffs will have to show that GEICO's decision to place that occupation in group 5 was racially motivated.  The arguments on both sides are likely to turn on two factors:  (1) the extent to which GEICO's decision to categorize an

occupation in group 5 is actuarially sound and (2) the extent to which the categorization disproportionately disadvantages African-Americans.  The evidence about these two factors will almost certainly differ for each of the nearly 800 occupations in group 5.

To illustrate:  State troopers are assigned to group 5.  Suppose that ninety-five percent of state troopers are white, and that, as a group, state troopers have a terrible loss experience.  Under these circumstances, GEICO's decision to give unfavorable treatment to state troopers would provide no evidence whatsoever that GEICO was using occupation as a proxy for race.  Members of the putative class who were state troopers would be unable to prove that *their* occupation was placed in group 5 because of racial animus — i.e., that GEICO had discriminated against *them* by using "occupation" in the underwriting process.

Day-care workers are also assigned to group 5.  Suppose that day-care workers are disproportionately African-Americans, and that their loss experience is pretty good — in fact, similar to the loss experience of occupations in group 2.  Under these circumstances, GEICO's decision to give unfavorable treatment to day-care workers would provide evidence (although certainly not conclusive evidence) that GEICO was using occupation as a proxy for race. Members of the putative class who were day-care workers might very well be able to prove that GEICO had discriminated against *them* when it used "occupation" in the underwriting process.

To try this proposed class action, then, the parties would have to work their way through each of the roughly 800 occupations that GEICO places in group 5.  The more rational the classification of a particular occupation — that is, the more the classification of a particular occupation was backed by sound actuarial evidence that the occupation was a good predictor of risk — the less weight that classification would have as evidence of racial animus.  Likewise,

-18-

even if a particular classification was irrational, it would have little weight as evidence of racial animus if the classification did not have a disparate impact on African-Americans.  At the end of the day, a jury might very well conclude that state troopers (and those in, say, 678 other occupations) had not been subjected to racial discrimination, but that day-care workers (and those in, say, 122 other occupations) had been subjected to racial discrimination.

Plaintiffs argue that it is unlikely that a jury will need to review the evidence at this level of detail.  Instead, plaintiffs assert, GEICO has always categorized occupations generally by educational level, and this distinction, which persists today, correlates highly with race.  Thus, plaintiffs claim, GEICO's practices should be analyzed at a higher level of abstraction — at a "policymaking" level.  At that level, plaintiffs contend, all class members share in common the question whether GEICO's decision to categorize occupations by the level of education required was a deliberate attempt to use education and occupation as a cover for racial discrimination.

Under this theory, plaintiffs say, they would offer evidence regarding group-5 occupations *as a group*.  In particular, plaintiffs would offer evidence that African-Americans are disproportionately represented among group-5 occupations *generally* (even if they are not represented disproportionately — or hardly at all — among certain group-5 occupations).  Likewise, plaintiffs would offer evidence that the claims experience of those in group-5 occupations is *generally* not poor (even if the claims experience of certain group-5 occupations is abysmal).  Under this scenario, plaintiffs contend, the evidence with respect to the issue of liability would be common to the class.

The problem for plaintiffs is that GEICO does not *make* decisions at the level at which plaintiffs say they will *challenge* decisions.  According to the evidence submitted to the Court,

GEICO did not simply categorize occupations by education and then leave it at that.  Instead, since it first created occupational categories for use in underwriting, GEICO has relied primarily on data about its own claims experience with respect to various occupations.  In other words, GEICO does not analyze group-5 occupations (or group-4 occupations or any other group of occupations) *as a group*.  Instead, GEICO classifies particular occupations as group 5 based on data specific to that occupation, regardless of the level of education required by that occupation.

In addition, GEICO has continually reevaluated its categorizations, sometimes with outside input.  Based on its claims experience with particular occupations, GEICO has moved occupations from more-favored groups to less-favored groups, or from less-favored groups to more-favored groups.  And critically for present purposes, GEICO has moved occupations from one group to another even though the level of formal education required by the occupations remained unchanged, conclusively establishing that GEICO does not simply categorize occupations by the level of formal education required.

As explained above, the evidence about how and why GEICO uses occupation in underwriting — the evidence on which plaintiffs' discrimination claims will turn — simply does not apply to the class as a whole.  Consequently, no matter what plaintiffs say, the issue of GEICO's intent cannot be adjudicated on a class-wide basis.  *Cf. In re Monumental Life Ins. Co.*, 365 F.3d 408, 414, 419 n.18 (5th Cir. 2004) (noting that, had the plaintiffs not limited their claims to the defendant insurers' explicit use of race as an underwriting factor, but instead had persisted in challenging allegedly pretextual underwriting factors (which included, among other things, education and occupation), individualized hearings on liability would have been necessary).

There is a second problem with plaintiffs' attempt to characterize the liability issue as common to the class.  GEICO argues that class certification is improper because, given the different weights that GEICO assigns to underwriting characteristics at different times, in different locations, and under different circumstances (such as underwriting versus reunderwriting), GEICO has in effect used hundreds of different underwriting models throughout the class period.  It is not possible, GEICO argues, for a jury to find a single, company-wide "intent" with respect to so many different models.

As a general matter, the Court agrees with plaintiffs that, if they could prove that GEICO intentionally used education and occupation as a means to discriminate on the basis of race, the fact that the particular weight assigned to these characteristics varied would not necessarily preclude adjudicating liability on a class-wide basis.  But that proposition assumes that plaintiffs have some way of proving intent without reference to the disparate impact of GEICO's practices. In this case, though, plaintiffs intend to rely heavily — almost exclusively — on disparate impact.  Plaintiffs have nothing like a smoking gun, such as a memo from a GEICO executive instructing underwriters to find a way to use ostensibly race-neutral criteria to charge higher premiums to African-Americans.  Rather, plaintiffs intend to present expert testimony that education and occupation are not good measures of risk, and expert testimony that GEICO's use of those factors has had a disparate impact on African-Americans.  Needless to say, for a jury to assess whether and to what extent disparate impact is proof of intentional discrimination, a jury will need to know exactly what that impact was.  And in light of the variations in the weights assigned to education and occupation at different times and in different locations, that impact would be extremely difficult to assess on a classwide basis.

-21-

It is thus apparent that the one question of fact that would seem to be shared by every member of the class — whether GEICO intended to discriminate against members of the class on the basis of race — cannot, in fact, be litigated on a class-wide basis.  Plaintiffs have identified no other consequential fact that could be adjudicated on a class-wide basis.  The Court therefore concludes that plaintiffs have failed to satisfy the prerequisite of commonality.

## 2.  Typicality

For the same reasons that plaintiffs have failed to meet the commonality requirement, plaintiffs have also failed to meet the typicality requirement.  Generally speaking, plaintiffs' claims are typical of those of the class if they arise from the same event or course of conduct and give rise to the same legal or remedial theory.  *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996).  But "[t]he presence of a common legal theory does not establish typicality when proof of a violation requires individualized inquiry."  *Elizabeth M.*, 458 F.3d at 787.  As discussed above, plaintiffs' claims will largely depend on the strength of the actuarial evidence supporting GEICO's decisions to classify their particular occupations in group 5 and the extent to which those decisions had a disparate impact on African-Americans.  As this evidence will vary by occupation, and as the putative class members may be in any one of nearly 800 occupations, plaintiffs' claims are not typical of those of the class.[7]

---

[7]The Court notes that there are other reasons why plaintiffs' claims may not be typical of those of the class.  Plaintiffs seem to be a particularly poor group of risks for reasons that have nothing to do with their education, occupation, or race.  One or more plaintiffs drove without insurance, failed to pay their premiums, submitted multiple claims in a short period of time, and were convicted of driving offenses.  At a minimum, these facts would substantially complicate their discrimination claims against GEICO.

*B.  Rule 23(b)*

Although the Court has already concluded that plaintiffs have failed to meet the threshold requirements of commonality and typicality, the Court also notes that certification would not be warranted under Rule 23(b).

1.  Rule 23(b)(2)

Plaintiffs first argue that the Court should certify a class under Rule 23(b)(2), which states that a class action may be maintained if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]"  Unlike (b)(3), (b)(2) does not require that common issues predominate, but "even greater cohesiveness generally is required than in a Rule 23(b)(3) class."  *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1121 (8th Cir. 2005). Although racial-discrimination claims are often cited as a paradigmatic example of a 23(b)(2) class, in this case the particular means through which GEICO allegedly accomplished the discrimination — through the use of allegedly pretextual underwriting characteristics — splinters the class into hundreds of discrete groups.  Thus, the proposed class lacks the cohesion necessary for certification under 23(b)(2).

A further problem with certification under 23(b)(2) is that such certification is proper "only when the primary relief sought is declaratory or injunctive."  *Id.*; *see also* Fed. R. Civ. P. 23 advisory committee notes, 1966 amendment, subdivision (b)(2) ("The subdivision [(b)(2)] does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages.").  GEICO argues that, because plaintiffs seek compensatory and punitive damages as well as an injunction, certification under 23(b)(2) is inappropriate.

-23-

Plaintiffs attempt to do an end run around this issue by characterizing the monetary relief they seek as equitable.  *See* Pls.' Second Am. Compl. ¶¶ D-E (seeking "[e]quitable relief," including a constructive trust and an order requiring GEICO to disgorge any premium overcharges "in compliance with equity").  This argument is frequently made but rarely successful.  As the United States Supreme Court has observed:

> Almost invariably . . . suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty.  And money damages are, of course, the classic form of legal relief.

*Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002) (citations, quotations, and brackets omitted).  In contrast, in order to seek restitution in equity, the money or property at issue must be clearly traceable to particular funds or property in the defendant's possession.  *Id.* at 213.  That is not the case here.  Instead, plaintiffs "seek no more than compensation for loss resulting from [GEICO's] breach of legal duty."  If this monetary relief predominates over the injunctive and declaratory relief sought in this case, Rule 23(b)(2) certification is not appropriate.

Courts have articulated various tests for determining whether monetary relief predominates over injunctive relief for purposes of 23(b)(2).  Although neither the parties nor the Court are aware of an Eighth Circuit case that sets forth a specific test for determining whether monetary relief predominates, the Eighth Circuit has considered plaintiffs' failure to prove that they would sue for the injunctive relief even in the absence of a claim for damages as a factor counseling against certification.  *In re St. Jude*, 425 F.3d at 1122 (quoting *In re Rezulin Prods. Liability Litig.*, 210 F.R.D. 61, 73 (S.D.N.Y. 2002)).

-24-

In this case, none of the three plaintiffs is currently a GEICO policyholder; one of them does not even own a car.  Although they express a vague interest in returning to GEICO should GEICO cease its unlawful practices and price its policies more competitively, plaintiffs have had difficulty describing the injunction they seek.  At oral argument, after conceding that there was nothing *per se* illegal about using education and occupation in underwriting, and after struggling with multiple questions from the Court about the contours of the equitable relief that they were seeking, plaintiffs finally suggested that the Court should enjoin GEICO from using education and occupation "unlawfully" (leaving GEICO free to use education and occupation "lawfully").  Hr'g Tr. 124.  Such an injunction would almost certainly be void for vagueness, and it would be nearly impossible for a Court to monitor compliance with such an injunction.  *Cf. McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 283 (5th Cir. 2008) (vacating as vague an injunction that directed the defendant to "cease and desist all racially biased assignment and promotion practices").

It is apparent from plaintiffs' pleadings and other papers, and from plaintiffs' struggles at oral argument, that they in fact have little interest in obtaining an injunction.  Their focus is clearly on obtaining monetary relief.  The Court therefore concludes that, as in *St. Jude*, plaintiffs have failed to prove that they would bring the lawsuit solely to obtain injunctive relief even in the absence of monetary damages, and that failure "[b]olster[s]" this Court's conclusion that certification under 23(b)(2) is inappropriate.  *St. Jude*, 425 F.3d at 1122.

2.  Rule 23(b)(3)

In the alternative, plaintiffs seek certification under Rule 23(b)(3), which states, in relevant part, that a class may be certified if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Even if there were a question of fact common to the class, that question would not predominate over the numerous questions of fact (discussed above) that affect only portions of the class.  Certification under 23(b)(3) is thus also inappropriate.

ORDER

Based on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.    Plaintiffs' motion for leave to file supplemental authority in support of class certification [Docket No. 118] is GRANTED.

2.    Plaintiffs' motion to certify class [Docket No. 65] is DENIED.


Dated: September 24, 2008                    s/Patrick J. Schiltz
                                             Patrick J. Schiltz
                                             United States District Judge

-26-